1

U.S. DISTRICT COURT
DISTRICT OF MAINE
PORTLAND
RECEIVED & FILED

JAN 16 2026

ERIC M. STORMS, CLERK

BY_____
DEPUTY CLERK

**U.S. District Court, District of Maine**
**Edward T. Gignoux U.S. Courthouse**
**156 Federal Street**
**Portland, ME 04101**

Case No. _____

Jane Doe, ("Maketa S/ Jolly") "and similarly
situated persons"

|  |  |
|---|---|
|  | **Petition for Judicial Review/** |
|  | **State Conspiracy** |
|  | **Civil Rights Violation** |
| Plaintiff, | **Section 1983 & 1985(3)** |
|  |  |
| v. | Case No. _____ |
|  |  |
| Jennifer B. Colin, in her |  |
| Personal and professional |  |
| Capacity; Vermont Office of |  |
| Professional Regulation |  |
| Defendant. |  |

---

**Conspiracy To Commit an Offense Against the United States (18 U.S.C. § 371)**

---

Name Jane Doe, ("Dr. Jolly")
Firm (if applicable)
Address filed under seal
Telephone number 484.442.0104

Attorney for
 Pro Se Filing Party

The fundamental legal inquiry centers upon whether 18 U.S.C. § 371, the general federal conspiracy statute, exhibits congruence or divergence when juxtaposed with state conspiracy statutes, particularly regarding their requisite elements, the mandate of an overt act, and the penalties authorized. Section 371 stipulates that any two or more persons who conspire either to commit an offense against the United States or to defraud the United States, or any agency thereof, in any manner or for any purpose, and one or more of such persons executes any act to effect the object of the conspiracy, shall be subject to a fine, imprisonment for a term not exceeding five years, or both. Furthermore, the statute provides that in those instances where the offense constituting the object of conspiracy is solely classified as a misdemeanor, the maximum punishment imposed shall not exceed that prescribed for the underlying misdemeanor offense.

State-sanctioned oppression or corresponding indifference would be analogous to the infamous Woolworths cafeteria case. The U.S. Woolworth's racial discrimination lawsuit, stemming from the historic lunch counter sit-ins against F.W. Woolworth Co. in the 1960s where Black patrons were refused service, proved pivotal in the Civil Rights Movement, catalyzing significant protests and ultimately resulting in the desegregation of their establishments. Modern legal cases involving the Australian company Woolworths (a distinct entity) frequently pertain to employment discrimination, exemplified by a 2014 case where the company paid damages for posing inappropriate questions on job applications, and recent executive lawsuits alleging age and/or disability discrimination against state disinformation practitioners.

The National Council of State Boards of Nursing (NCSBN), an independent 501(c)(3) organization incorporated in Delaware, maintains its principal offices in Chicago, Illinois. This Chicago-based non-profit entity retains the exclusive rights to the development, ownership, and administration of the National Council Licensure Examination for Registered Nurses and Licensed Practical Nurses

(NCLEX-RN and NCLEX-PN). States neither possess ownership of the examination nor function as stakeholders or custodians in the development of this non-profit assessment.

Nevertheless, securing access to the licensure examination necessitates an application submitted through the respective state boards of nursing, followed by state review and subsequent approval of examination and licensure eligibility. The core legal question presented to the courts in this matter of public interest is whether the Vermont Board of Nursing instituted an alternative application protocol, specifically targeting Black professionals, that was devoid of due process and intended to deny each minority applicant their examination rights and licensure through the State of Vermont. The denial of licensure typically culminates in the denial of employment prospects or effectively mandates employment in capacities below the applicant's qualifications, particularly when such licensure has been unconstitutionally withheld.

The courts should evaluate the alternative licensure eligibility standards for examination and licensure in this state against the current Vermont Nurse Practice Act, which mandates the implementation of due process procedures for application denials. This case will establish that Phillis Mitchel, an architect and employee of the State of Vermont, utilized her position to introduce undocumented and unverifiable state alternative examination and licensure procedures for minority applicants seeking examination and licensure through the Vermont Board of Nursing.

Contemporary society is marked by a disequilibrium in social expectations, often entangled with individual perceptions of, or access to, specific benchmarks of achievement. As noted subsequently, while numerous parallels can be drawn to similar issues that arose during the 1960s and the post-Civil Rights era of 1964, none may be more salient than the deployment of state employment mechanisms to impede minority populations' access to meaningful and economically advantageous employment. The record and exhibits suggest that an individual named Philis not only appeared to have leveraged her

employment discriminatorily, but evidence indicates she convened with the architects of the alleged

discriminatory program in Minneapolis, Minnesota, around 2018. This meeting, which reportedly

occurred during a National Council of State Boards of Nursing annual gathering, was ostensibly to

implement alternative procedures against minority women who were, in fact, participants in federal

class-action litigation against Excelsior College, potentially as a retaliatory measure. Joanne Leone, a

New Jersey-based attorney and former Executive Director of the New Jersey Board of Nursing, provides

evidence demonstrating that these non-minority women were involved in determining the academic

efficacy of Vermont Board of Nursing applicants. Crucially, each utilized alternative procedures for

these application determinations and subsequently referenced the minority women as either attendees of,

or participants in, welfare programs.

This legal dispute centers on issues of public interest, specifically asserting differential and

disparate treatment seemingly predicated on race within the context of discriminatory ideology. Dr.

Jolly, an African American woman, is compelled to defend her reputation and professional standing

against a group of state employees who allegedly implemented an alternative licensure procedure. This

purported action infringed upon a vested property interest, leading to both financial loss and reputational

harm. Several of the overt acts detailed in the conspiracy count aligned with the actions alleged in the

substantive counts. Each of the substantive offenses determined to have occurred were committed in

furtherance of the conspiracy.

*See in United States v. Rabinowich, 238 U.S. 78, 88:*

The combination of two or more individuals for the purpose of committing or causing the

commission of a breach of the laws constitutes an offense of the utmost gravity. Such an act can, at

times, represent a greater public injury than the mere execution of the contemplated unlawful deeds. It

necessitates a deliberate plot to undermine the legal framework, thereby training and preparing the

conspirators for continued and habitual criminal endeavors. Furthermore, it is marked by secrecy, which impedes detection, prolongs the time required for its discovery, and thus amplifies the significance of its punishment upon revelation."

*See also Sneed v. United States, 298 F. 911, 912-913; Banghart v. United States, 148 F.2d 521.*

In the pivotal case of ***Regents of Univ. of California v. Bakke,*** this Court examined a medical school's set-aside program based on race, which reserved 16 of 100 available seats for members of designated minority groups. The resulting decision yielded six distinct opinions, none of which achieved a majority. All governmental classifications predicated on race are subject to analysis by a reviewing court under the strict scrutiny standard. ***Adarand Constructors, Inc. v. Peña, 515 U. S. 200, 227***. Race-conscious action that is necessary to advance a compelling governmental interest does not contravene the Equal Protection Clause, provided that such action is narrowly tailored to achieve that interest. ***See, e. g., Shaw v. Hunt, 517 U. S. 899, 908.*** The specific context is relevant when evaluating such action. ***See Gomillion v. Lightfoot, 364 U. S. 339, 343-344***. Not every decision influenced by racial considerations is equally objectionable, and strict scrutiny is designed to offer a framework for meticulously scrutinizing the importance and genuineness of the government's justification for utilizing race in a specific circumstance. Pp. 326-327.

The three alleged offense types are not identical. ***Bollenbach v. United States, 326 U.S. 607, 611; United States v. Sall, 116 F.2d 745***. The broader question presented herein is whether it is highly probable or less than likely that Phillis Mitchel, a Vermont Board of Nursing staff member, met with various state boards of nursing during her attendance at the National Council State Board of Nursing meeting in Minneapolis, Minnesota, in August 2018, for the purpose of generating fraudulent state

materials subsequently represented as Vermont Board of Nursing examination and licensure determinations. Although the materials, now located in Pennsylvania records, appear to be categorically fraudulent, the differences in offenses are not merely verbal. Ibid. The essence of conspiracy is the agreement; the essence of aiding, abetting, or counseling is consciously advising or assisting another to commit specific offenses, thereby becoming a party thereto; and the essence of the substantive crime is the completion of the offense, which constitutes a step beyond mere aiding, abetting, or counseling.

A formal investigation, conducted by Washington D.C. legal counsel, was initiated regarding the presence of fraudulent state materials within the National Practitioner Databank (NPDB), a federal congressional repository. Documentation secured by the D.C. law firms substantiates that federal agencies received fraudulent applications and electronic communications originating from the Vermont Board of Nursing. Communications authored by Excelsior College, a New York non-profit operating as Excelsior University, designated as a Cease-and-Desist request, formed the basis for which each state designed its denial process. It is pertinent to note that the Vermont Board of Nursing failed to accredit Excelsior College as an acceptable school of nursing and allegedly deemed its academic and clinical programming deficient. Consequently, its graduates are ineligible for nurse examination through the Vermont Board of Nursing. As the Executive Director for the Vermont Board of Nursing, Mitchel is tasked with the responsibility of accrediting potential nursing schools in the State of Vermont. Therefore, she presumably knew that utilizing her state of Vermont email for correspondence and failing to implement due process procedures for minority state applicants would constitute a violation of federal due process procedures and standard Vermont of Nursing application standardizations.

This New York business, Excelsior College communication occurred on or about August 15, 2018, precisely coinciding with the annual National Council of State Boards of Nursing conference held in Minneapolis, Minnesota. At that time, Excelsior College was reportedly confronting its fourth class-

action lawsuit filed in New York by minority students, alleging academic failures, misrepresentation, and fraud.

Kaufman Borgeest and Ryan are a New York-based law firm that purports to function as an extension of various state entities. It is believed that, under the guise of subcontracted legal services, the firm obtains access to state information systems. In the present case, Kaufman Borgeest and Ryan maintained subcontracted legal services with the State of New Jersey on behalf of the New Jersey Attorney General, specifically providing services for the New Jersey Board of Nursing. The firm also provided legal representation for Excelsior College concerning a diaspora of class action claims initiated in 2014 by minority students. It appears the New York non-profit Excelsior College attracts prospective consumers through internet marketing and advertising.

Excelsior College, a non-profit institution based in New York, has been the subject of various allegations brought forth by former students, claiming violations of New York general business laws over an extended period. The alleged mechanism of this conspiracy, based on the compiled evidence and evidentiary materials, is as follows: Mitchel, acting as a representative of the State of Vermont on behalf of Excelsior College, a New York non-profit, engaged in activities including the composition and distribution of emails to officials of the New Jersey Board of Nursing, specifically those she encountered during the Minneapolis annual conference. Subsequently, state boards of nursing referenced Excelsior College during adjudication hearings against minority class action members, notwithstanding each board's cognizance that Excelsior College was not an approved provider of nursing academic instruction.

The New Jersey State Office of the Board of Nursing (NJBON) receives legal counsel through a subcontracted agreement with the New Jersey Attorney General's Office, facilitated by the law firm Kaufman, Borgeest, and Ryan. Significantly, this same law firm previously represented Excelsior College throughout its protracted six-year federal class action lawsuits. Evidence suggests that the firm

capitalized on its contractual relationship with the NJBON, allegedly culminating in the creation and

agreed dissemination of fraudulent state materials. These materials were purportedly intended for

submission to federal courts as authentic state concerns but were reportedly designed to impugn the

reputation of minority women associated with the federal class action. Dr. Jolly was formerly a member

of the action class.

Their objective appears to have been to prevent the aforementioned plaintiff and other African

Americans from seeking the equal protection of the laws and from exercising the equal rights,

privileges, and immunities of citizens under the laws of the United States and the State of Vermont,

through such passive coercion, discrimination, and intimidation. These rights include, but are not limited

to, the rights to freedom of speech, movement, association, and assembly; the right to petition their

government for the redress of grievances; the rights to security of their persons and dwellings; and the

rights not to be deprived of life and liberty except by due process of law.

In furtherance of their conspiracy, defendants willfully, intentionally, and maliciously menaced

and passively assaulted each of the aforementioned plaintiffs by denying their applications for licensure

examination and exerting unbridled authority against each without affording due process or other forms

of judicial relief. Concurrently, they uttered racial epithets describing each plaintiff in derogatory terms

and asserted that a non-academic provider was the sole basis of their educational attainment, despite

possessing certified transcript data. These actions were intended to obstruct the plaintiffs' upward

mobility and inflict financial injury, resulting in the deprivation of licensure, the inability to leverage

their education for professional advancement, and causing immediate injury, financial suffering, extreme

instability, mental anguish, and emotional and physical distress.

Through their concerted conspiracy and subsequent actions, the defendants have deliberately and maliciously, both directly and indirectly, intimidated and prevented the plaintiffs, and other African Americans, from enjoying and exercising their fundamental rights, privileges, and immunities as citizens of the United States. These infringed rights include, but are not limited to, the rights to freedom of speech, movement, association, and assembly; the right to petition their government for redress of grievances; the right to be secure in their person; the right not to be subjected to enslavement or entrapment, nor deprived of life, liberty, or property except by due process of law; and their rights to apply for state credentialing through examination without restraint, on the same terms afforded to white citizens of Vermont and New Jersey.

*The provision continues, specifying the motivation required "for the purpose of depriving, either directly or indirectly, of any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws." This language is, of course, similar to that of § 1 of the Fourteenth Amendment which in terms speaks only to the States, and judicial thinking about what can constitute an equal protection deprivation has, because of the Amendment's wording, focused entirely upon identifying the requisite "state action" and defining the offending forms of state law and official conduct.*

A similar construction of § 1985 (3) is corroborated when one examines its associated statutory provisions. Three potential forms exist for a state action limitation upon § 1985 (3): first, that the action must have occurred under color of state law; second, that there must be interference with or influence upon state authorities; or third, that the private conspiracy must be so extensive and efficacious that it effectively supplants those authorities, thereby fulfilling the state action requirement.[5] The Congress that enacted the Civil Rights Act of 1871, 17 Stat. 13, § 2 of which serves as the antecedent to § 1985 (3), explicitly addressed each of these three scenarios in other sections of the same Act. A prerequisite element of the cause of action established by the first section, currently codified at 42 U. S. C. § 1983, is that the alleged deprivation must have been perpetrated under color of state law.

Information secured through third-party attorney retrieval suggests that Mitchel engaged in meetings with women from New Jersey and other parties and, furthermore, appeared indifferent to the utilization of unsubstantiated unofficial Vermont Board of Nursing applications by the New York law firm Kaufman Borgeest

and Ryan in its written responses to valid legal rebuttals within federal courts. Although the content presented in legal briefs concerning the Black class action members did not constitute official state reports, they were characterized as communications between the law firm and, upon information and belief, Phillis Mitchel.

Subsequently, formal complaints were lodged with the Vermont Secretary of State regarding the law firm's appropriation of that office as a legitimate rebuttal. Under the authority of the state, official complaints seeking injunctions against the New York law firm were made to Lauren S. Hibbert, Director of the Vermont Board of Nursing, but were not granted. It was later ascertained that no official complaints were filed with the Vermont Board of Nursing concerning Dr. Jolly's Vermont RN application, at least not within the Vermont Board's judicial or administrative records. It appears that the strategy employed by the non-minority women involved developing non-standard electronic emails, which were exchanged among themselves and subsequently provided to the law firm. This was done for the purpose of creating disinformation materials to be presented in the Excelsior College class action trials, where minority women had alleged fraud and violations of New York general business laws.

The constitutionality of § 1985 (3) extending to private conspiracies, thereby encompassing the deprivation of others' legal rights, is beyond dispute. Precedent has firmly established the constitutionality of 18 U. S. C. § 241, a criminal statute of significantly broader scope (see n. 4, supra), which also addresses wholly private conspiracies. *See, e. g., In re Quarles, 158 U. S. 532; Logan v. United States, 144 U. S. 263, 293-295; United States v. Waddell, 112 U. S. 76, 77-81; Ex parte Yarbrough, 110 U. S. 651.* See generally *Twining v. New Jersey, 211 U. S. 78, 97-98*. Consequently, Courts examination need only determine the source of authority to regulate the private conspiracy alleged within the present complaint.

### *Law of Negligence*

The law of negligence seeks to establish liability exclusively for those injuries that qualify as the natural and probable consequences of the defendant's conduct, as opposed to outcomes arising from exceptional or unforeseeable sequences of events.

The relevant federal statute mandates the presence of three requisite elements: an agreement between a minimum of two individuals, the necessary intent to achieve an illicit objective, and the commission of an overt act in furtherance of the conspiratorial design. Judicial precedent consistently maintains that the agreement itself constitutes the gravamen of the offense, while the requirement of an overt act serves to demonstrate that the conspiracy has progressed beyond mere deliberation into tangible action. ***See United States v. Jimenez Recio, 537 U.S. 270 (2003).***

Requests were submitted to the National Practitioner Data Bank (NPDB), a congressional repository, under the Privacy Act to gain access to materials provided by various state boards of nursing concerning Dr. Jolly. These materials relate to allegations stemming from claims that Mitchel met with New Jersey and other state board of nursing officials to assist in the construction of emails and supporting documentation, which allegedly developed disinformation for submission into federal trials filed in the New York federal courts. The Washington D.C. law firm located emails from Mitchel to Leone, New Jersey Board of Nursing, dated July 2018, in which Mitchel explicitly writes that she sought to provide New Jersey, a state where Dr. Jolly does not reside, with information concerning Dr. Jolly's January 2018 application for examination with the Vermont Board of Nursing. The federal courts should note that Dr. Jolly failed to disclose this information or provide the states with approval to release her private data to tertiary parties. However, the law firms found information dating back to July 2018, indicating Mitchel's participation. In the email, she states, "Here's the information you requested regarding Maketa Jolly," and adds, "I can't wait to meet you in Minneapolis, Minnesota," which further suggests cooperation. August 2018 was the annual conference of the National Council State Board of Nursing in Minneapolis MN where state officials met to discuss healthy patient safety goals.

## Count I.
## First Element

---

The Vermont Board of Nursing ("the Board") is maintained through state oversight and statutory laws as defined by the state's adoption of the Vermont Nurse Practice Act. Consequently, the educational achievements of nurse applicants are assessed through statutory laws, specifically in terms of the requisite educational capacity required to be eligible for licensure as a Registered Nurse or Practical Nurse in the State of Vermont. The evidence presented below overwhelmingly supports the conclusion that staff members, particularly under the administrative direction of Lauren S. Hibbert and Jennifer B. Colin, ("Vermont Board of Nursing Directors")

possessed reasonable knowledge that Phillis Mitchel, a Vermont Board of Nursing staffer, engaged in a conspiracy while attending a 2018 conference sponsored by the National Council of State Boards of Nursing in Minneapolis, MN.

**A)** The evidence presented shows that two or more persons mutually agreed to commit an offense(s) against the United States, as specified in the complaint. (The elements of the offense(s) will be explained shortly.)

**B)** It is alleged that officials representing the State of Vermont, following their attendance at the 2018 National Council State Board of Nursing annual conference in Minneapolis, Minnesota, likely entered into an agreement to produce fraudulent, unofficial state materials for the benefit of disrupting federal class action trials through the dissemination and production of unofficial state disinformation materials. Subsequent state boards are then purported to have presented these Vermont Bord of Nursing materials as official state documentation against minority federal class action litigants involved in the ***Shewanda Williams v. Excelsior College*** class action trials filed in the *United States Eastern District of New York.*

Regulations established by the Equal Employment Opportunity Commission (EEOC) under Title VII of the Civil Rights Act prohibit race and color discrimination in employment and licensure applications. This prohibition encompasses the elimination of barriers, such as biased pre-employment tests or licensure requirements, to ensure that Black individuals (and persons of all races) are not unfairly precluded from professional opportunities due to reliance on stereotypes or practices that disproportionately disadvantage them without demonstrable business necessity. This historical context is underscored by landmark cases such as ***Griggs v. Duke Power Co***., which illustrated how ostensibly neutral testing standards had the effect of excluding Black applicants, thereby establishing rules against manipulating scores or imposing discriminatory cutoff thresholds.

- **Title VII of the Civil Rights Act of 1964**: Prohibits discrimination based on race, color, religion, sex, or national origin in hiring, firing, pay, training, and all employment terms, including tests and licensure. Protects individuals of all races from disparate treatment (intentional bias) and disparate impact (neutral

policies with discriminatory effects). Must be job-related and a business necessity; employers can't use tests that disproportionately exclude a race unless justified, nor can they adjust scores by race. Title VII aimed to end segregation where Black people were relegated to unskilled jobs, broadening protections beyond explicit bias.

A landmark case illustrates how standardized examinations, such as those for high school diplomas or intelligence tests, disproportionately excluded Black applicants, even in the absence of overt racial bias. This demonstrates that discrimination can arise from seemingly neutral employment requirements. These principles address subtle forms of discrimination, including biased algorithms or criteria (e.g., hair texture, ancestry) that disadvantage Black applicants in examinations or licensing procedures. As noted, applications for Registered Nurse licensure were submitted to the State of Vermont. Dr. Jolly had received a travel assignment offering a substantial economic advantage. Applications were made to the State of Vermont seeking approval to sit for the third NCLEX-RN examination. At this time, Dr. Jolly possessed an Associate's degree and a Bachelor's degree and was actively pursuing a graduate degree.

Certified transcripts from accredited brick-and-mortar universities, along with the requisite application fee, were provided to the board. For months, the board failed to issue a response. When state officials finally engaged, staffers created employment barriers regarding Dr. Jolly's applications for licensure, citing the Vermont Board of Nursing Nurse Practice Act, Section 3, circa 2015. The Vermont Board of Nursing failed to provide a formal letter of denial or any definitive due process procedure nor response concerning the application. Instead, it implemented an alternative procedure that did not cite academic deficiencies; rather, the denial was issued through the board's counsel, Gabriel Gilam, in an effort to dissuade Dr. Jolly or oppose her application for licensure.

Previously, Dr. Jolly held the title of Licensed Practical Nurse for an estimated fifteen years prior to her academic advancement. These and other remarks were presented to the Vermont Secretary of State, compelling the state to allow her the opportunity to sit for the occupational examination, specifically the RN examination for

advancement. This private communication filed with the State of Vermont was later discovered in federal trials involving Excelsior College and introduced in the adjudication proceedings of New Jersey against Dr. Jolly's reputation and person. In that case, Washington D.C. attorneys found that the non-minority regime of state staffers which includes Phillis Mitchel, utilized Dr. Jolly's demographic material, located within Vermont Board of Nursing applications, to draft unverifiable application claims with various state boards of nursing. To this day, the State of New Jersey has been unable to produce a New Jersey Licensed Practical Nurse (NJLPN) application or a similar document from Dr. Jolly, but has produced an official letter from the State of Vermont, drafted by Dr. Jolly, which appears to have been altered by state officials for the purpose of submission into federal trials on behalf of Excelsior College.

It is alleged that Phillis Mitchel, a staff member of the Vermont Board of Nursing, was involved in the creation of unauthorized, deceptive State of Vermont emails. These emails ostensibly served as a form of authority for other participating states, thereby generating a conspiratorial, fraudulent state illusion. The evidence strongly suggests that Phillis Mitchel was a party to or a member of an agreement established with the New Jersey Board of Nursing during the annual National Council of State Boards of Nursing meeting in Minneapolis, Minnesota.

This state action allegedly caused the economic deprivation of Black women to secure favorable trial outcomes on behalf of a non-academic provider, Excelsior College, located in the State of New York. There appears to be no official portal or judicial order signed by a New Jersey judge that formally authorized New Jersey officials to obtain materials through the Vermont Board of Nursing. Furthermore, a comprehensive records search reveals an absence of judicial motions and asserted legal filings. Similar to the situation in Vermont, New Jersey lacked substantial or credible data to suggest that the board engaged in administrative proceedings or disclosed judicial complaints in connection with Dr. Jolly's application for examination and licensure. This suggests that the federal communications, which purported to have received official state communication, were merely the result of two women who utilizing their positions of employment during the 2018 annual Minneapolis,

MN conference decided to support a New York law firm by generating false documents. This action allegedly caused the economic deprivation of Black women to secure favorable trial outcomes on behalf of a non-academic provider, Excelsior College, located in the State of New York.

# Count II
# Liability for Negligence

Negligence law does not impose liability merely because harm follows a careless act. Rather, the plaintiff (Dr. Jolly) must establish that the injury was the natural and probable consequence of the defendant's breach of duty and that it fell within the scope of risks reasonably anticipated. *See Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 162 N.E. 99 (1928) (Cardozo, C.J.) (holding that liability is limited to harms within the foreseeable zone of danger).* Courts have consistently held that liability will not attach where the injury occurs in a manner that is wholly fortuitous, haphazard, or so attenuated from the negligent conduct that it cannot be deemed foreseeable. *See Restatement (Second) of Torts § 431 (1965) (proximate cause requires a "substantial factor" connection between conduct and harm); Doe v. Manheimer, 212 Conn. 748, 563 A.2d 699 (1989) (rejecting liability where harm resulted from unforeseeable criminal act).*

The inappropriate drafting of emails that sought to assert authority over Dr. Jolly's application for state licensure concerning academic knowledge or fraudulent behavior circumvented the Vermont Board of Nursing's administrative laws and the due process procedure for making or having made such claims against Dr. Jolly's application. A review of State content failed to indicate that the Vermont Board of Nursing initiated any administrative procedure associated with Dr. Jolly's application for Registered Nurse examinations through its regulatory board. Typically, when an applicant applies for state credentialing based on educational qualifications, the state is required to conduct a thorough review of

transcripts and all other documentation to determine the applicant's eligibility for examination for potential nurse licensure.

The inappropriate drafting of emails that sought to assert authority over Dr. Jolly's application for state licensure concerning academic knowledge or fraudulent behavior circumvented the Vermont Board of Nursing's administrative laws and the due process procedure for making or having made such claims against Dr. Jolly's application. A review of State content failed to indicate that the Vermont Board of Nursing initiated any administrative procedure associated with Dr. Jolly's application for Registered Nurse examinations through its regulatory board. Typically, when an applicant applies for state credentialing based on educational qualifications, the state is required to conduct a thorough review of transcripts and all other documentation to determine the applicant's eligibility for examination for potential nurse licensure.

A review of state records, initiated through voluminous requests made under the Vermont Secretary of State Open Records Act (OPRA) and the Right to Know Law ("Sunshine, Right to Know Law"), has revealed a lack of evidentiary materials suggesting that the Vermont Board of Nursing formally commenced any administrative process regarding Dr. Jolly's application for authorization to sit for the Registered Nurse licensure examination. Instead, it appears that official state communications (email) were generated through alternative state procedures by Phillis Mitchel, a Vermont Board of Nursing staffer who purportedly asserted authority over Dr. Jolly's RN examination application. State records do not indicate that the Vermont Board of Nursing, through its board or officials, made any allegations of academic deficiencies or insufficiencies concerning Dr. Jolly's pursuit of vocational licensure through the state.

The Vermont Nurse Practice Act (NPA), codified primarily under 26 V.S.A. Chapter 28, along with associated rules, defines and governs nursing practice within the state. This legislation sets standards for licensure, scope of practice for Licensed Practical Nurses (LPNs), Registered Nurses (RNs), and Advanced Practice Nurses (APRNs), outline disciplinary actions, and serves to protect the public. The Vermont Board of Nursing manages this Act, ensuring safety and

As the Executive Director of the Vermont Board of Nursing, Phyllis Mitchell's work duties are defined within the scope of the Vermont Nurse Practice Act. According to Section 2 of the Act, the Executive Director's primary work duties are as follows:

The Office employs an Executive Director of the Board. 26 V.S.A. § 1574(b). The powers and duties of the Executive Director include those appropriate to carry out the work of the Board and to execute State policy respecting the regulation of nursing practice, including without limitation: (a) guiding Office staff in the conduct of the Board's affairs, the execution of Board directives, and the administration of applicable laws and policies; (b) appointing members of committees created by statute, these rules, or directive of the Board; (c) interpreting policies, making administrative decisions, and providing consultation regarding Board affairs such as nursing education, examination, registration, licensure, renewal, and practice questions; (d) surveying and monitoring nursing education programs; (e) preparing agendas, reports, and recommendations to the Board, and attending to official correspondence on the Board's behalf; (f) orienting new Board members and nursing staff; (g) monitoring evolving policy and practice issues that may call for Board action. (h) referring instances of misconduct and hazards to the public health, safety, and welfare to the Office's Enforcement Division and providing expert support to prosecutors as appropriate; (i) representing the Board at meetings, symposia, conferences, and the like; and (j) such other lawful duties as may be delegated by the Board or the Director in furtherance of the Board's mission and policies.

Notwithstanding these duties, the evidence does not indicate that Mitchell filed a complaint with the Board of Nursing regarding any board concerns about Dr. Jolly's academic performance or history, nor did she make an official Vermont Board of Nursing request for additional evidence to support Dr. Jolly's academic history. In association with the application, Dr. Jolly was required to submit it, and the Vermont Board of Nursing was provided with certified copies of her conferred associate and bachelor's degrees at that time.

Where the Vermont Board of Nursing or Director is permitted by law or rule to accept certain training or experience on the basis of equivalence to a fixed standard, it is the burden of the applicant or licensee to establish

equivalence to the Board or Director's satisfaction, by producing credible, clear, and convincing evidence of the same. The Board and the Office have no obligation to research the bona fides of any institution, program, course, degree, certification, practicum, fellowship, or examination.

Official correspondence was sent electronically to the Vermont Board of Nursing on or about June 2018 by Donna Kerscher, an Excelsior College Registrar employee. This correspondence highlighted the area of Registered Nurse instruction that the applicant, Dr. Jolly, had satisfactorily completed. The correspondence referenced official degrees conferred by Rowan Southern New Jersey Community College as sufficient evidence to demonstrate that Dr. Jolly possessed the requisite knowledge to be eligible for examination through the State of Vermont. All of this information was included in, or comprised of, Dr. Jolly's documentation.

The documentation also included the completion of her bachelor's level education from a prominent New England University. Collectively, Dr. Jolly met or exceeded the state's standard for eligibility to be seated for the examination. However, the process was apparently hindered, seemingly diverted under the guise of employment through the office of Michel, on behalf of the New Jersey Board of Nursing. This action appears to have assisted Excelsior College with its calculated purpose of introducing disinformation materials into federal class action trials.

As the Executive Director of the Vermont Board of Nursing, Phyllis Mitchell's work duties are defined within the scope of the Vermont Nurse Practice Act. According to Section 2 of the Act, the Executive Director's primary work duties are as follows:

When reviewing the Board's administrative requirements regarding applications and educational concerns, Mitchell's authority is limited to referencing academic qualifications and alleged fraudulent conduct, without triggering the required board and applicable Vermont Board of Nursing administrative procedures. These acts of notification to New Jersey and all others violate Vermont's own board statutes and thus strongly suggest that Mitchell, under the guise of employment, sought to collaborate with unknown state actors for the purposes of

entrapment and/or fabrication of material facts. The circumventing of Vermont Rule 3 of the Board's Administrative Rules, which governs applications, complaints, and contested applications, denied due process, which the Vermont Board of Nursing failed to provide.

The Vermont Administrative Procedure Act explicitly prohibits agencies from adopting informal practices that supplant rulemaking or adjudicatory processes. *See 3 V.S.A. § 800(6) (agencies may not avoid rule adoption or due process through informal policy).* Drafting emails that assert authority without initiating a contested case proceeding under *3 V.S.A. § 801(2)* and the Board's rules not only violates statutory mandates but also erodes public trust in the integrity of Vermont's professional regulation system.

The limited nature of Mitchel's' authority, coupled with her involvement and agreement with the New Jersey Board of Nursing, specifically with Joanne Leone, a former New Jersey attorney during the NCSBN annual meeting in 2018, to develop disinformation materials for use in Excelsior College federal class action trials, was manifestly clear and entirely unconnected with her state employment as the Vermont Executive Director.

### Improper Communications Undermine Regulatory Integrity and Exceed Statutory Authority

Dr. Jolly applied for nursing licensure under the Vermont Board of Nursing's authority. During the application process, the Board allegedly failed to provide adequate notice of deficiencies, an opportunity for a hearing, or a meaningful appeal mechanism prior to denying or delaying licensure, in this instance, right out refusal to process her application. These omissions occurred despite requirements under the Vermont Nurse Practice Act and the Board's administrative rules, which mandate due notice and hearing before adverse actions.

The Vermont Nurse Practice Act (Title 26, Chapter 28) grants the Board authority to regulate licensure but requires procedural safeguards, including notice and hearing. The Board's administrative rules, effective May 11, 2023, outline contested case procedures and declaratory rulings intended to protect these rights. Failure to apply these provisions constitutes a violation of Vermont law and the Fourteenth Amendment's Due Process Clause.

The alleged disparate treatment of minority applicants implicates Title VI of the Civil Rights Act of 1964, which prohibits discrimination in programs receiving federal financial assistance. Because the Board operates within a state agency that benefits from federal funding, its practices are subject to Title VI compliance. These allegations also support claims under 42 U.S.C. § 1983 for deprivation of rights under color of state law.

The Vermont Administrative Procedure Act explicitly prohibits agencies from adopting informal practices that supplant rulemaking or adjudicatory processes. See **3 V.S.A. § 800(6)** (agencies may not avoid rule adoption or due process through informal policy). Drafting emails that assert authority without initiating a contested application case proceeding under **3 V.S.A. § 801(2)** and the Board's rules not only violates statutory mandates but also erodes public trust in the integrity of Vermont's professional regulation system.

Evidence suggests that minority candidates experience disproportionate delays, denials, or additional requirements compared to similarly situated non-minority applicants. Professional licensure constitutes a protected property interest under the Fourteenth Amendment; therefore, deprivation without adequate notice and a hearing violates due process. For more than seven years, Dr. Jolly has reported inconsistent communication, opaque criteria, and the denial of opportunities to contest adverse decisions to the Vermont State Department of State, which oversees the Vermont Office of Professional Regulation, without receiving adequate responses from the State of Vermont.

In addition to procedural failures, Dr. Jolly asserts that minority applicants, including herself, were subjected to disparate treatment compared to non-minority candidates. This included delays, additional requirements, and inconsistent communication that created systemic barriers to licensure. Such conduct, now proven, constitutes discrimination under Title VI of the Civil Rights Act and Vermont's anti-discrimination statutes. The allegations also raise equal protection concerns, as the Board's actions appear to have disproportionately impacted individuals based on race or ethnicity.

The legal issues center on whether the Board's conduct violated procedural due process, equal protection, and federal civil rights obligations Courts should consider an enumerated judicial review under Vermont law seated in diversity to determine if injunctive relief to enforce compliance with due process standards, and federal investigation under Title VI and 42 U.S.C. § 1983.

These claims underscore the need to better understand Mitchel's participation during the 2018 Minnesota, MN annual NCSBN meeting n relation to her implementation of alternative procedure for application and or licensure of Dr. Jolly, which includes the unauthorized release of Vermont application data for appears to be the benefit of Excelsior College during its federal trials without a subpoena or standard judicial directive. The conspiracy and disguise language of what finally became § 1985 (3) appears to have been borrowed from the parent of 18 U. S. C. § 241. *See Cong. Globe, 41st Cong., 2d Sess., 3611-3613 (1870).*

Courts need not decide, if the Vermont Board of Nusinf, Ofice pf Professial Regulation engaged indisciruiminatory acts, the eviene is clear, the board failed toimplement standard procedurtral due process procedures that denied the facts of this case, whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable under the portion of § 1985 (3) before us. Cf. Cong. Globe, 42d Cong., 1st Sess., 567 (1871) (remarks of Sen. Edmunds).

Promoting the integrity of any licensure process should be of the utmost concern to state officials. However, over the years, it has been well-documented that state officials in Vermont lacked the reasonable knowledge or understanding that their state agency, the Vermont Board of Nursing, had previously engaged in acts including the unlawful distribution of specific state documents targeting Black federal class-action members. This effort was allegedly to assist a non-profit New York organization for which Vermont Board staffers may have reasonably known or met to discuss the processes used to deny examinations and licenses to minority groups. Forcing such individuals to remain in poor employment opportunities, as mentioned above, constitutes no less than 1960's-era employment deprivation.

In November 2019, Diversified Maintenance Systems, LLC, a janitorial service provider, agreed to a settlement of $750,000 and significant equitable relief to resolve a federal lawsuit alleging race discrimination, harassment, and retaliation. The complaint asserted that since at least January 2012, Diversified engaged in a sustained pattern or practice of race discrimination against African American job applicants in the Maryland, Washington D.C., and Philadelphia metropolitan areas. Specifically, the company was alleged to have refused to hire Black applicants for custodian, lead custodian, or porter positions and to have racially harassed a Black janitorial supervisor in the presence of customers and employees.

Furthermore, the lawsuit contended that following the supervisor's complaint, the company demoted him, altered his work assignments, hours, and conditions, and subsequently terminated his employment. The resulting 30-month consent decree prohibits Diversified from engaging in discrimination or harassment based on race, as well as any form of retaliation. The decree states that the company appoints an internal monitor to ensure adherence to its terms. Additionally, Diversified is required to implement a targeted hiring plan that systematically tracks the number and race of applicants, along with the reason(s) for non-selection. The company must also establish a policy prohibiting harassment and retaliation and provide comprehensive training on the prevention of discrimination, harassment, and retaliation. *EEOC v. Diversified Maintenance Systems, LLC., Case No. 8:17-cv-01835 (D. Md. settlement announced Nov. 25, 2019).*

In December 2014, two Memphis-based affiliates of Select Staffing, employment companies doing business in Tennessee, agreed to pay $580,000 to settle allegations they engaged in race and national origin discrimination. The EEOC's lawsuit charged that the staffing firms had discriminated against four Black temporary employees and a class of Black and non-Hispanic job applicants by failing to place or refer them for employment. The four temporary employees said while seeking employment through the company's Memphis area facilities, they witnessed Hispanic applicants getting preferential treatment in hiring and placement. ***EEOC v. New Koosharem Corp.*, No. 2:13-cv-2761 (W.D. Tenn. consent decree filed Dec. 5, 2014).**

Mitchel's deployment of alternative procedures under the guise of employment suggests a public interest case and highlights a societal issue wherein non-minority staff members may exploit or misuse their official state positions, resulting in the oppression or denial of upward mobility for minority applicants. This includes restrictions concerning examinations for Registered Nurse (RN) employment. Although Dr. Jolly does not possess a criminal record, does not participate in federal healthcare

programs, and has yet to obtain copies of the actual application purportedly filed with the New Jersey

Board of Nursing for RN licensure, it appears that a highly skilled, collaborative group of non-minority

legal practitioners acted on behalf of another entity for the implementation of alternative procedures.

Subsequently, the Washington D.C. law firm also noted that white attorneys familiar with federal and

state legal processes were the curators of the state-sanctioned disinformation campaign supported by

state officials.

### Societal Impact

More recently, we have witnessed both the worst and the best of America during a period of

social unrest. Unfortunately, the upward achievement of minorities often appears insufficient to some or

threatening to others. Dr. Jolly reasonably should not have been deprived of the opportunity to earn an

estimated $120,000 per year, according to the contract she signed for employment at Vermont Hospitals.

It appears that deprivation arises through various forms of both direct and indirect hatred.


Governor Phil Scott of Vermont reasonably knew that his office had received complaints

concerning discrimination and misuse of office, including the production of disinformation and the

constitution of falsehoods, and yet took no action. He also reasonably knew that information his office

shared with New Jersey officials would be used in an unofficial capacity, yet appearing official. The

letter written to his office by Dr. Jolly implicated her fundamental right to privacy, and his office

reasonably knew that there was no judicial order requiring the release of such sensitive occupational

data to New Jersey. Dr. Jolly was neither a resident of New Jersey nor employed in New Jersey at the

time of Vermont's release of correspondence written to the Vermont Governor's and Secretary of State's

offices by Dr. Jolly.

It is compelled to believe that if Governor Scott's office released Dr. Jolly's private and sensitive material to an unknown third party who alleged himself or herself to be a state official, he failed to provide requisite protections for Dr. Jolly's demographic information. Furthermore, he failed (Phil Scott) to ensure that she (Dr. Jolly) had equal access to examination, or at the minimum, that the board provided due process, none of which was conducted.

The impacts are not only societal but also psychological. The psychological toll that hatred, bigotry, and discrimination place on minority groups is overwhelming and lasting. In this case, it was psychological, emotionally, and financially taxing on Dr. Jolly and her family, as it stripped her of her financial ability. State officials later referred to her or inferred that she was a welfare recipient, all of which were attempts to humiliate, circulate disinformation, and deny her access to examination and licensure opportunities. At best, this appears to meet the standard for judicial consideration for racial hatred and discrimination.

### Prayer for Relief

Dr. Jolly respectfully petitions the Court for a permanent injunction to prohibit the State of Vermont from any use or distribution, both public and private, of her demographic materials. This also includes a request for the immediate and permanent expungement and destruction of the public record to include all prior applications filed with the State of Vermont, specifically the Vermont Board of Nursing information that contains her demographic materials, ensuring they are permanently removed from all public records. Furthermore, Dr. Jolly seeks the imposition of sanctions and fines against the State of Vermont, as deemed necessary by the federal government, and any other relief the Court deems appropriate.

/s/

Dr. Maketa S. Jolly